EARLSBORO GAS CO. v. VERN H. BROWN DRILLING CO. et al.

No. 24507. Dec. 17, 1935.

A. B. Carpenter, B. C. King, and W. A. Delaney, Jr., for plaintiff in error.

E. C. Stanard, Leonard Carey, and Norton Stanard, for defendants in error.

PER CURIAM. This is an appeal from the district court of Pottawatomie county. The parties occupy the same position here as in the trial court and will be referred to as p'aintiff and defendants.

The plaintiff instituted this action for the purpose of securing a personal judgment against the Vern H. Brown Drilling Company, a corporation, E. H. Brannon, C. H. Carter, Mrs. Claude Cummings, J. L. Emerick, H. G. Faust, Emmett D. George, A. P. Gibson, B. E. Green, D. P. Hamilton, A. L. Harris, Howard Hopps, Shay Hunt, Noah P. Keene, C. E. Key, Mrs. T. S. Kinloch, C. D. Lacy, R. C. Ledford, J. M. Marquis, M. P. Mathis, H. A. McDonald, Z. N. Neel, H. T. Nesbitt, E. L. Rodman, J. C. Sanders, James H. Smith, H. G. Spaulding, Geo. Theodore, C. E. Thornton, F. H. Walker, Wm. Withington, and Sun Lumber Company, as partners, and for the foreclosure of a materialman's lien on an oil and gas lease in the town of Earlsboro, Okla., and to bar the National Supply Company, Midwest, a corporation, Continental Supply Company, a corporation, Frick-Reid Supply Corporation, a corporation, and Federal National Bank of Shawnee, Okla., of any right, claim or interest that they might have therein. The plaintiff dismissed without prejudice as to the defendant Howard Hopps, and the defendants National Supply Company, Continental Supply Company, Frick-Reid Supply Corporation, and Federal National Bank of Shawnee, Okla., asserted no claim as against the property in question and hence may be dismissed from further consideration herein.

The Vern H. Brown Drilling Company, a corporation, filed its separate answer admitting a written contract between the plaintiff and said defendant, the furnishing of gas thereunder, and averred that any obligation by reason thereof was said defendant's individual responsibility, but pleaded payment of all the amount due and entered a general denial as to all other allegations in the plaintiff's petition. The defendant E. L. Rodman filed an unverified general denial; defendant Sun Lumber Company filed unverified general denial, coupled with an admission that it claimed an interest in the property by reason of a certain judgment which it held against its codefendant Vern H. Brown Drilling Company. All of the other defendants filed a joint verified answer denying the allegations of plaintiff's petition generally and specifically denying the allegation of agency and partnership therein contained. The cause was tried to the court without the intervention of a jury partly upon stipulations between the parties as to the facts and partly upon testimony and evidence introduced at the trial. It was conceded at the trial that the indebtedness was based upon gas furnished to the Vern H. Brown Drilling Company and used by it in drilling a well on a leasehold estate belonging to all of the defendants, and plaintiff conceded that said gas was furnished upon the individual credit and responsibility of the Vern H. Brown Drilling Company, and that at the time said contract was entered into and said gas furnished the plaintiff did not know and was not aware of the existence of any trust, partnership, or other association between the defendants. It was further admitted that the defendants had never held themselves out as partners and that no credit to the Vern H. Brown Drilling Company had been induced thereby. Upon the conclusion of the hearing the trial court rendered judgment in favor of the plaintiff for the full amount prayed for in its petition as against the defendant Vern H. Brown Drilling Company, a corporation, and further judgment for the foreclosure of the plaintiff's lien on the premises whereon said gas had been furnished and used, but found that the defendants were not partners and refused to give the plaintiff a personal judgment against the other defendants. The plaintiff appeals from this judgment and makes eleven assignments of error in this court and discusses them under two propositions. We are of the opinion that a determination of the first proposition so advanced is decisive of this appeal and therefore our discussion will be limited thereto.

It is the contention of the plaintiff:

"That the parties to the instrument denominated 'Declaration of Trust' and those who received certificates of beneficial interest thereunder are partners and their rights and liabilities are fixed by law in relation to partnerships."

The record discloses that on and prior to September 9, 1929, Z. N. Neel was the owner of an oil and gas mining lease covering certain lots in the town of Earlsboro, Okla.; that on September 9, 1929, Z. N. Neel entered into a contract with the Vern H. Brown Drilling Company, a corporation, whereby he assigned to the said Vern H. Brown Drilling Company his interest in said lease on the condition that the said Vern H. Brown Drilling Company should drill a well to the Wilcox sand on the premises described in said lease, and with the further proviso that when said well was actually spudded in that the said Z. N. Neel was to have one-eighth interest in the production therefrom; that thereafter, and on September 25, 1929, the said Z. N. Neel and Vern H. Brown Drilling Company executed an instrument which they denominated "Declaration of Trust," whereby they attempted to convey to the Federal National Bank of Shawnee, Okla., as trustee, all of their interest in said lease. Subsequent to the execution, acknowledgment, and recording of this instrument in the office of the county clerk of Pottawatomie county, the Vern H. Brown Drilling Company entered into a written contract with the plaintiff herein whereby the plaintiff was to furnish and the Vern H. Brown Drilling Company was to purchase gas in its drilling operations and under which contract the plaintiff furnished gas used in drilling a well on the lease belonging to the defendants herein. Plaintiff contends that said "Declaration of Trust" was insufficient to create a trust and therefore resulted in a general partnership, and that while it was unaware of such partnership at the time that it furnished the gas in question, nevertheless upon the subsequent discovery of such condition, that it may enforce liability against the individual members thereof at its election. In order to determine whether this position is well taken, it is essential that we examine the instrument in question. The pertinent provisions of said instrument are:

"First. That the party of the first part and the party of the second part do hereby assign, transfer, convey and deliver unto the said Federal National Bank of Shawnee all of their right, title and interest in and, to the oil and gas mining lease hereinbefore described; to have and to hold the same unto the said the Federal National Bank of Shawnee, Okla., as trustee, pursuant to the terms, provisions and conditions embodied in this Declaration of Trust.

"Second. That the title of this trust (fixed for convenience) shall be Shawnee Chief Oil Production Trust No. 1; that the term 'trustee,' as used herein, shall be deemed to include the original trustee and its successors; that this trust shall exist for a period of 20 years, unless sooner terminated in some legal manner, whereupon all of the property of every kind held hereunder shall be sold by the trustee and the net proceeds equitably distributed to the persons then entitled thereto.

"Third. It is agreed and understood that the management and control of the business and affairs of this trust in the development and operation of the property and project, and in disposing of its production, shall be vested in a committee of three, consisting of L. J. Milburn, U. S. Hart, and Newton Barrett, or in the event of a vacancy in said committee, by a person selected by the vote of a majority in interest of the unit-holders.

"Fourth. It is further agreed and understood that all contracts negotiated by the committee shall be made in the name of the trustee and executed by it, and that all money and funds accruing to the trust from every source, including money received for sale of units and sale of production, shall be collected, held, and disbursed by the trustee; provided, however, that all checks on the funds belonging to the trust shall be issued by the trustee and countersigned by two members of the committee, and the countersigning of checks thus drawn shall be considered as full authority for the trustee to disburse such funds and the approval of the item covered thereby.

"Fifth. It is agreed and understood that the committee shall divide the said project into 80 units, calling for an one-eightieth each of the total project, and provide suitable certificates evidencing such units; that thereupon the trustee shall immediately issue certificates to Z. N. Neel, the party of the first part, for ten (10) of said units, which shall be accepted by him in lieu of the one-eighth interest provided for in said written contract, which is hereto attached as Exhibit 'A' and to this extent the said contract is superseded and abrogated; when the well on the said project has actually been spudded in, the trustee shall, upon written demand by the committee, issue certificates to the Vern H. Brown Drilling Company, party of the second part herein, for ten (10) of said units; if and when the well has been drilled to a depth of 2,000 feet, then the trustee shall on written demand of the committee issue to the said party of the second part certificates for fifteen (15) of said units; if and when the said well has been drilled to a depth of 3,000 feet, then the trustee shall on written demand of the committee issue to the said party of the second part certificates for ten (10) of said units; in this connection it is distinctly understood that the sole responsibility for the issuance of the certificates called for in the last three groups shall rest with and upon the said

committee; it is agreed and understood that the said committee shall be and it is hereby empowered to dispose of the remaining thirty-five (35) units as follows: Fifteen (15) shall be sold by the committee at not less than $1,000 each if and when the said fifteen (15) units have been thus sold and paid for, then ten (10) additional units shall be sold at not less than $1,250 each; if and when the said ten (10) units are thus sold and paid for, then the committee shall sell the remaining ten (10) units at not less than $1,500 each; upon requisition in writing by the committee and upon receipt of the proceeds therefor, the trustee shall issue certificates to any and all such purchasers of units on the form of certificate furnished by the committee and approved by the trustee; it is understood in this connection, however, that the units which may be offered for sale and sold by the committee as aforesaid are primarily the property of the party of the second part, but pledged and appropriated for the purpose of securing the performance of the said written contract in the drilling of the well contemplated therein and to the payment of all labor and material bills in connection therewith: therefore, if and when the well has been completed and paid for, as provided in the said written contract hereto attached as Exhibit 'A' and contemplated by this trust agreement, it is agreed and understood that the party of the second part shall be entitled to receive from the trustee certificates for all such units as may remain unsold, and free from the conditions herein imposed upon them; the responsibility, however, for the issuance of certificates for any units called for under this contingency shall rest upon the committee, but it shall be the duty of the trustee to issue such certificates upon written requisition by the committee; the certificate issued for all units shall be registered on the books of the trustee and the trustee shall be liable and accountable to no person, except the registered holder thereof.

"Sixth. Upon requisition in writing by the committee, the trustee shall disburse the funds received from the sale of units to the party of the second part, or its order as follows: one-third (⅓) thereof when the well, being drilled on said block, has reached a depth of 2,000 feet; an additional one-third (⅓) is to be paid when the well has reached a depth of 3,000 feet, and the remaining one-third (⅓) is to be paid on completion of said well to the Wilcox sand.

"Seventh. It is further made a condition of this article of trust that the purchaser of said units, as hereinabove set out, shall for the consideration above set out, be deemed to be purchasing interests in a completed well, but that when said well is completed, and if and when production of oil in paying quantities results, then each and all of the unitholders shall share equally in the pro-

portions that their interest bears to the entire project in the expense of operating said well, but no operating costs or expense of any kind or character shall be paid by this trustee except upon bills or statements rendered in writing by the party to whom said account is alleged to be due, and which bills or statements shall be approved in writing by not less than two members of the committee.

"Eighth. It is agreed that the committee shall meet within three days after the trustee has received the proceeds from all oil or gas run for the preceding calendar month and determine and declare on records to be kept by them the net profits to the trust for the calendar month in question; the committee shall meet and proceed in like manner each and every calendar month during the active life of this trust; that after the committee has met and thus determined the net profits for the preceding calendar month, it shall request the trustee in writing to distribute the net profits thus determined pro rata to the unitholders; within seven days after the committee has met, as aforesaid, the trustee shall issue to each registered unitholder a check for his pro rata part of such net profits and mail the same to him at his last-known post office address."

Express trusts in both real and personal property are authorized by the laws of this state, the applicable provisions of the statute being found in sections 11820-11823, O. S. 1931. We have had occasion to discuss these provisions of the statute in Liquid Carbonic Co. v. Sullivan et al., 103 Okla. 78, 229 P. 561, wherein this court said:

"An instrument providing for the holding of property by trustees for the owners of assignable certificates, representing the beneficial interest in the property, may create a trust, or it may create a partnership, dependent upon the way in which the trustees are to conduct the affairs committed to their trust. If they act as principals and are free from the control of the certificate holders a trust is created, but if they are subject to the control of the certificate holders, it is a partnership."

As has apt'y been said by the Supreme Court of Arkansas in the case of Betts v. Hackathorn, 159 Ark. 621, 252 S. W. 602, 31 A. L. R. 847:

"Whether a partnership or strict trust is created by an indenture depends on the language and provisions involved."

Bearing the above rules in mind it will be noted that the language and provisions of the instrument now under consideration show that the trustee therein was such substantially in name only and that the control and management of the business and affairs of the association was by the terms of said

instrument vested in a committee, which committee is authorized to make contracts; give the nominal trustee directions in carrying out his duties; countersign checks and to otherwise determine all matters of policy on the part of the association. Any directions by the committee were mandatory upon the nominal trustee, and a careful reading of the instrument discloses that said trustee was in effect nothing more than a bookkeeper or clerk. While it is sometimes difficult to determine whether a trust has been created or not, it is universally recognized that where the trustee is divested of control and is made subservient to the beneficiaries, that whatever else may be created by said instrument, a trust is not created thereby. We can safely say that the instrument now under consideration was ineffective, both under the statutes and the decisions of this and other courts, to establish an express trust. It therefore remains to inquire whether it created a general partnership between the individuals associated thereunder. It will be observed that the instrument vests control and management, making of contracts and matters of policy, in a certain committee; that the members generally are not clothed with any authority to deal with or for or on behalf of the others, and that it was not the intention of the parties to create a partnership. While as said by Judge Story in section 49 of his Work on Partnership:

"The true rule ex aequo et bono, would seem to be that the intention and agreement of the parties themselves should govern in all cases. If they intend to form a partnership in the capital stock, or in the profits or in both, then that same rule should apply in favor of third persons, even if the agreement was unknown to them, and, on the other hand, if no such partnership was intended between the parties, then there should be none as to third parties unless the parties held themselves out as partners to the public or their conduct operated as a fraud or deceit upon third persons."

We are aware that such rule has not been adopted by the majority of courts, but that the accepted rule is that it is not what is actually done that is controlling. Applying this latter construction to the instrument in question it is apparent that the parties effectually organized a joint stock company; the situation being analogous to that where persons associate themselves in business for the purpose of organizing a corporation, but fail to perfect a de facto much less de jure organization, but engage in business through a board of directors or managers. Had the parties intended to organize a joint stock company they could have scarcely drawn an instrument to carry out their intention more effectually than they did in this case. One definition of a joint stock company is found in 20 R. C. L. page 1074, in the following language:

"Another definition of a joint stock company is that it is an association of individuals for the purpose of profit, possessing a common capital contributed by the members composing it, such capital being commonly divided into shares, of which each member possesses one or more, and which are transferable by the owner, the business of the association being under the control of certain selected individuals called directors."

And while joint stock companies are regarded as partnerships, yet there are several important distinctions as stated in 20 R. C. L. page 1076, as follows:

"But such companies are not entirely controlled by the legal rules and principles that govern ordinary partnerships. One distinction is that the death of a member does not ordinarily dissolve the joint stock company where it does have that effect in an ordinary partnership; and in a joint stock company there is no delectus personae as in the ordinary partnership. Nor is a joint stock company dissolved by the transfer of the interest of one member to a stranger, for it is fundamental that the members may freely alienate their shares in such companies without consulting the other members. Another distinction is that in a partnership each member speaks and acts as the agent of the firm, while this is not true of a joint stock company. Its affairs are conducted by trustees or managers and an individual member of a stock company has no power to sell and otherwise dispose of its property, or to act for and bind the company. On the other hand, there is no obligation on the members to contribute to the company their individual experience, skill or services."

Where any obligation is incurred by the managers of a joint stock company, the members are individually liable therefor in the same manner as in the case of a general partnership. As said in Doyle-Kidd Dry Goods Co. v. A. W. Kennedy & Co., 154 Ark. 573:

"Persons who associated themselves in business for the purpose of organizing a corporation, and who participated in the management of the business through a board of directors, but who failed in any way to comply with the statutory requirements as to formation of corporations or to limit their liability as partners, as provided by ch. 137 of Crawford & Moses' Dig., are liable as partners for the debts contracted by such managers; the organization being a common-law joint stock company."

So here the defendants sought to create an

express trust, in which effort they failed and instead organized a joint stock company. The plaintiff admits that when it sold the gas in question to the Vern H. Brown Drilling Company, it did so without any knowledge of the existence of the joint stock company and upon the sole credit and responsibility of the Vern H. Brown Drilling Company. As we have seen, members of a joint stock company are not liable as general partners except in instances where the indebtedness is incurred by its managers or has been ratified by them. The managers of the joint stock company here were the committee named in the instrument, and the Vern H. Brown Drilling Company was not one of them. Therefore, under these circumstances, the trial court was correct in holding that the defendants were not general partners and were not liable to the plaintiff by virtue of being members of a joint stock company. This conclusion makes it unnecessary to discuss any of the other propositions advanced by the plaintiff. There being no error in the record and the law being with the defendants, the judgment of the trial court will be affirmed.

Judgment affirmed.

McNEILL, C. J., OSBORN, V. C. J., and BAYLESS, WELCH, and CORN, JJ., concur.